**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**APPROXIMATELY $4,224,384.96 IN U.S. CURRENCY SEIZED FROM ACCOUNT NO. 898156223325 AT BANK OF AMERICA N.A. IN THE NAME OF THERON MEDICAL CENTER LLC.**

**Defendant *In Rem*.**

# VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through its undersigned counsel, alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(C) and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Rules of Civil Procedure, to forfeit seized funds[1], more fully described as approximately $4,224,384.96 in U.S. currency formerly on deposit in account number 8981 5622 3325 held at Bank of America, N.A. in the name of Theron Medical Center LLC (the "Theron Account"),

[1] All dates and amounts referenced in this Verified Complaint are approximate.

which was seized on or about May 22, 2026, to include accrued interest.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3. This Court has *in rem* jurisdiction over the Defendant Asset. *See* 28 U.S.C. §§ 1345, 1355(b).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the Defendant Asset were brought upon seizure. *See* 28 U.S.C. §§ 1355(b)(1).

## III. FACTUAL ALLEGATIONS

At all times material to this Action:

A. <u>The Medicare Program and Skin Substitutes</u>

5. The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to individuals who are 65 years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

7. Individuals who received benefits under Medicare were commonly referred to as "Medicare beneficiaries."

8. Medicare was a "health care benefit program," affecting interstate

commerce as defined by 18 U.S.C. § 24(b).

9. Medicare was subdivided into multiple program "parts." Medicare Part B covered, among other things, physician services and outpatient care, including medically necessary skin substitute and skin graft products applied to beneficiaries in non-facility settings, such as a beneficiary's home.

10. Skin substitutes, also referred to as cellular and/or tissue-based products or skin grafts, were products that included amniotic-tissue-based allografts such as Simplimax used to aid in the closure of certain chronic, non-healing wounds, such as diabetic ulcers and pressure ulcers. Medicare reimbursed skin substitute products under product-specific Healthcare Common Procedure Coding System ("HCPCS") codes on a per-square-centimeter basis, together with associated application procedure codes.

11. Health care providers that provided items or services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an enrollment application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the enrolled provider a Medicare provider number.

12. A provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for items and services rendered to Medicare beneficiaries. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement, and were given access to Medicare

manuals and services bulletins describing billing procedures, rules, and regulations.

13. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company. A Medicare claim for a skin substitute product was required to set forth, among other things, the name and unique Medicare identification number of the beneficiary, the product provided and its size, the date of service, the place of service, the diagnosis, and the identity of the rendering provider.

14. A claim for a skin substitute product submitted to Medicare qualified for reimbursement only if the product was medically necessary for the treatment of the beneficiary's illness or injury, was ordered by a licensed physician or other qualified health care practitioner and was provided to the beneficiary as billed.

B. Theron Medical Center and the Fraudulent Billing Scheme

15. As further discussed below, between May and July of 2025, THERON electronically submitted $8,576,525 in fraudulent claims to Medicare as reimbursements for skin substitutes and skin grafts, that were medically necessary for the beneficiaries. Data provided by CMS shows that between June and July of 2025, Medicare disbursed $4,227,688.31 to the Theron Account before the account was voluntarily frozen by Bank of America. Pursuant to the seizure warrant signed by the Honorable Magistrate Elfenbein, the United States seized $4,224,384.96 in Medicare fraud proceeds from the Theron Account.

16. Theron Medical Center LLC ("THERON") was a Florida limited liability corporation, with its principal office address in Miami, FL, which is within the

Southern District of Florida.

17. Florida Department of State Division of Corporations records reflected that THERON was incorporated on October 21, 2024.

18. At all times relevant to this Complaint, the only manager of THERON was Richard Linares Suarez ("LINARES SUAREZ").

19. According to Medicare enrollment records, on March 17, 2025, THERON enrolled in Medicare as a Clinic/Practice Group, listing LINARES SUAREZ as its Authorized Official and identifying the Theron Account as the account into which Medicare was to deposit reimbursement payments.

20. As part of its Medicare provider enrollment application, on February 19, 2025, THERON submitted a voided check and an electronic funds transfer ("EFT") Authorization Agreement for the Theron Account.

C, The Medicare Fraud Scheme

21. As described below, between May and July of 2025, THERON submitted false and fraudulent claims to Medicare totaling $8,576,525 for skin grafts and skin substitutes, such as Simplimax that were medically unnecessary.

22. According to Medicare records, all claims submitted by THERON to Medicare during this period included the same diagnosis code for NON-PRESSURE CHRONIC ULCER OF UNSPECIFIED PART OF LEFT LOWER LEG.

23. Law enforcement interviewed five of the Medicare beneficiaries whose Medicare identification numbers THERON used to bill Medicare.

24. Each interviewed beneficiary stated that he or she was not familiar with

THERON, did not receive and did not need skin grafts and/or skin substitutes such as Simplimax billed to Medicare using his or her Medicare identification number, and was not familiar with Physician 1, who appeared in the Medicare claims data as the rendering provider on all of THERON's claims.

25. Physician 1 stated in an interview with law enforcement agents that he or she had never heard of THERON, and he or she had not prescribed skin grafts and/or skin substitutes to the identified beneficiaries. This provider stated that the identified Medicare beneficiaries were not his or her patients. Physician 1's prescriptions accounted for 100% THERON's total billed Medicare claims.

26. On June 11, 2025 and June 19, 2025, investigators also visited THERON's purported office in Miami during business hours, which they found was closed with the lights off on both occasions. There were no signs indicating THERON was an active business.

D. The Defendant Asset

27. The United States obtained bank records for the Theron Account, which showed that as of June 1, 2025, when Medicare disbursements into the Theron Account began, the account had a balance of $74.64.

28. Between June and July of 2025, as a result of THERON's claims for reimbursement, Medicare deposited $4,227,688.31 in U.S. currency into the Theron Account.

29. These Medicare deposits constituted approximately 83.29% of all total deposits into the Theron Account, as shown below:

| EFT Check Date | EFT Amount | Deposited Account Number |
|---|---|---|
| 4-Jun-25 | $ 95,286.88 | 898156223325 |
| 5-Jun-25 | $ 95,286.88 | 898156223325 |
| 6-Jun-25 | $ 95,286.88 | 898156223325 |
| 10-Jun-25 | $ 23,870.72 | 898156223325 |
| 11-Jun-25 | $142,832.32 | 898156223325 |
| 12-Jun-25 | $166,703.04 | 898156223325 |
| 13-Jun-25 | $ 83,400.52 | 898156223325 |
| 16-Jun-25 | $ 47,643.44 | 898156223325 |
| 17-Jun-25 | $ 369,065.16 | 898156223325 |
| 18-Jun-25 | $ 285,762.64 | 898156223325 |
| 20-Jun-25 | $ 595,298.00 | 898156223325 |
| 23-Jun-25 | $ 237,917.71 | 898156223325 |
| 25-Jun-25 | $ 559,442.92 | 898156223325 |
| 26-Jun-25 | $ 250,005.56 | 898156223325 |
| 30-Jun-25 | $ 381,343.52 | 898156223325 |
| 1-Jul-25 | $ 178,785.40 | 898156223325 |
| 2-Jul-25 | $ 35,757.08 | 898156223325 |
| 7-Jul-25 | $ 429,084.96 | 898156223325 |
| 9-Jul-25 | $ 154,914.68 | 898156223325 |
| **TOTAL** | **$ 4,227,688.31** | |

30. The remaining deposits into the Theron Account totaling $847,788.34 were counter credits and returned checks after reversals from Medicare reimbursement payments.

31. Based on bank records, on or about July 22, 2025, Bank of America closed the Theron Account and transferred its entire balance of $4,224,384.96 into a hold harmless account.

32. An analysis conducted in accordance with generally accepted accounting principles demonstrated that, as of July 22, 2025, Theron Account's entire balance of $4,224,384.96 was 100% traceable to Medicare reimbursements.

33. On May 22, 2026, pursuant to the seizure warrant signed by the

Honorable Magistrate Elfenbein, the United States seized $4,224,384.96 in Medicare fraud proceeds from the Theron Account (the "Theron seizure warrant"). *See* Case No. 26-MJ-02947-ELFENBEIN (S.D. Fla.).

34. Pursuant to the Theron seizure warrant, Bank of America remitted to the Federal Bureau of Investigation ("FBI") $4,224,384.96 in U.S. currency from the Theron Account (the "Defendant Asset").

## IV. BASIS FOR FORFEITURE

35. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such offense is subject to civil forfeiture.

36. Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

37. Health care fraud, in violation of 18 U.S.C. § 1347, is a "Federal health care offense." *See* 18 U.S.C. § 24(b).

## FIRST CLAIM
**Proceeds of Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

38. The factual allegations in paragraphs 1 through 37 are re-alleged and incorporated by reference as if fully set forth herein.

39. As set forth above, the Defendant Asset is property that constitute or is derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

40. Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, Plaintiff, the United States of America, requests that the Clerk of the Court issue a warrant for the arrest *in rem* of the Defendant Asset; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Asset; that the Defendant Asset be forfeited and condemned to the United States of America; and for such other and further relief as may be deemed just, necessary and proper.

Respectfully submitted,

**JASON A. REDING QUIÑONES**
**UNITED STATES ATTORNEY**

By: *<u>/s/ Sandra Demirci</u>*

Sandra Demirci (Court ID A5503244)
Assistant United States Attorney
500 East Broward Boulevard
Fort Lauderdale, FL 33394
Telephone: (954) 660-5959
Facsimile: (305) 536-7599
E-mail: sandra.demirci@usdoj.gov
*Counsel for United States of America*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Alexandria Davis, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation and that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement agents, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

Executed on this 22 of June 2026.

Alexandria Davis, Special Agent,
Federal Bureau of Investigation